13 P.3d 400 (2000)
In the Matter of the Honorable Frances-Ann FINE, District Judge for the County of Clark, State of Nevada.
The Honorable Frances-Ann Fine, District Judge for the County of Clark, State of Nevada, Appellant,
v.
Nevada Commission on Judicial Discipline, Respondent.
No. 33215.
Supreme Court of Nevada.
November 30, 2000.
*402 William B. Terry, Las Vegas, for Appellant.
Leonard I. Gang, General Counsel, and Frank J. Cremen, Special Prosecutor, Nevada Commission on Judicial Discipline, Carson City, for Respondent.
BEFORE THE COURT EN BANC.

OPINION
PER CURIAM:
In September 1998, the Nevada Commission on Judicial Discipline ("the Commission") held a formal hearing based on allegations that the Honorable Frances-Ann Fine *403 ("Judge Fine") violated various Canons of the Nevada Code of Judicial Conduct ("NCJC") and provisions of the Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline ("ARJD"). After the Commission determined that Judge Fine had indeed violated both the Canons of NCJC and the provisions of ARJD, the Commission disciplined Judge Fine by removing her from office.
For the reasons discussed herein, we conclude that clear and convincing evidence supports the Commission's findings that Judge Fine violated ARJD 11(3) and Canons 2, 2A, 3B(7), and 3C(4).[1] We further conclude that the Commission did not err in considering uncharged conduct committed by Judge Fine and that the Commission's decision to remove Judge Fine from her office was supported by the record in this case.

FACTS
In 1998, the Commission received a complaint from Marshall S. Willick, an attorney in Las Vegas who had appeared in numerous cases before Judge Fine. Willick's complaint asserted that Judge Fine had violated various provisions of ARJD and NCJC. On June 17 and 18, 1998, the Commission conducted a confidential probable cause hearing to determine whether there was a reasonable probability that the allegations against Judge Fine had merit. Upon the concurrence of the majority of the Commission, the Commission found that probable cause existed to establish that disciplinary action against Judge Fine could be warranted pending a formal hearing.
On July 23, 1998, the special prosecutor for the Commission filed a formal statement of charges against Judge Fine alleging that she had violated various Canons and provisions of NCJC and ARJD. Specifically, the special prosecutor alleged: (1) in Count I, that Judge Fine had violated ARJD 11(3) and Canons 2A and 3B(7) in March 1993 by conducting several ex parte communications with experts in McMonigle v. McMonigle, Case No. D124619, a case pending before her; (2) in Count II, that Judge Fine had violated ARJD 11(3) and Canons 2, 2A, and 3B(7) in May and December 1996 by conducting several ex parte communications with experts involved in Kinnard v. Kinnard, Case No. D186967, a case pending before her; (3) in Count III, that Judge Fine had violated ARJD 11(3) and Canons 2, 2A, and 3C(4) in 1996 by appointing her first cousin as a mediator in Kinnard, a case pending before her, without disclosing her relationship with the cousin and by later scheduling an order to show cause hearing as to why the parties should not be held in contempt of court for having failed to pay the cousin for her services; and (4) in Count IV, that Judge Fine had violated ARJD 11(3) and Canons 2, 2A, and 3B(7) in March 1997 by conducting an ex parte communication with an expert involved in Greisen v. Greisen, Case No. D196398, a case pending before her. On July 27, 1998, Judge Fine filed her answer to the above charges by denying any violations of ARJD or NCJC.
On September 2 and 3, 1998, the Commission conducted a formal evidentiary hearing.

Count I: McMonigle
At the hearing,[2] the special prosecutor presented a minute order from McMonigle dated March 29, 1993, that explicitly states that "[o]n March 28, 1993, Stephanie Crowley, the therapist working with the minor child . . . was contacted by the Court regarding her evaluation of the child conducted on Saturday, March 27, 1993." The minute order then details the substantive conversation that occurred between Dr. Stephanie Crowley and Judge Fine. The minute order suggests that *404 Judge Fine conducted the ex parte contact with Dr. Crowley because "the need for this information is pertinent to today's telephone conference and will aid in an efficient determination of this matter."
In addition, the same minute order provides that "[o]n March 30, 1993, Jennifer Henry, the law clerk for [Judge Fine] spoke to Stephanie Crowley, therapist." Again, the minute order details the substance of what Dr. Crowley discussed with Judge Fine's law clerk.
Dr. Crowley testified that she did have a telephone conference with Judge Fine on March 28, 1993, and that Mr. McMonigle hired her in late March 1993 to perform a psychological evaluation of his daughter. Eventually, Dr. Crowley's evaluation became important in custody proceedings that were pending before Judge Fine. William Sheldon, from the district court's Family Mediation and Assessment Center ("FMAC"), knew Dr. Crowley professionally and contacted her to ask her to give a summary of her findings to Judge Fine. On Sunday, March 28, 1993, Judge Fine called Dr. Crowley on the telephone at her home, and they had a conversation about Dr. Crowley's observations of the minor child. Although the minute order dated March 23, 1993, suggests that Judge Fine ordered Dr. Crowley to perform an assessment on the minor child in McMonigle before Mr. McMonigle contacted Dr. Crowley, Judge Fine testified that Mr. McMonigle had already approached Dr. Crowley before Judge Fine ordered Dr. Crowley to perform an assessment of the child. Moreover, Dr. Crowley expressly testified that Mr. McMonigle had hired her and had entered into a fee agreement with her.
The special prosecutor also presented a minute order dated June 8, 1993, which reflects that Judge Fine had a conference in chambers to discuss whether the custody of the minor child should be changed. The minute order shows that Judge Fine and Sheldon were present in chambers and that Dr. Crowley and Dr. Lewis Etcoff, another psychologist involved in the case, participated by telephone. The minute order also expressly indicates that no parties or their attorneys were present at this conference. Lastly, although no parties or their attorneys were present, the minute order shows that Judge Fine made findings of fact based on the discussions with Sheldon, Dr. Etcoff, and Dr. Crowley and that Judge Fine entered an order that physical custody of the minor child should remain with the father and that the child must remain in Clark County.
Both Dr. Crowley and Sheldon testified that on June 8, 1993, a conference occurred with Judge Fine and without the parties or their attorneys. Sheldon characterized the conference as "extremely unusual."
Judge Fine testified that she did engage in ex parte communications with experts in McMonigle. However, Judge Fine maintained that she took care to inform the parties of her discussions with Dr. Crowley by copying the minute order dated March 29, 1993, to the attorneys in McMonigle.

Count II: Kinnard
At the hearing, the special prosecutor presented a minute order from Kinnard dated October 26, 1995, which shows that Mrs. Kinnard was temporarily living in New Mexico. In an effort to mediate the continuing disputes between the parties, Judge Fine recommended and appointed Faith Garfield, a mediator in New Mexico, to attempt to mediate the differences between the parties. The minute order reflects that Judge Fine also appointed Dr. Marc Caplan, a psychologist, to the case in order to perform evaluations on the parties involved.
The special prosecutor also presented a letter from Garfield to Mrs. Kinnard dated May 10, 1996. The letter reflects that Garfield billed Mrs. Kinnard for a telephone conference that occurred in early May 1996 between Garfield, Dr. Caplan, and Judge Fine. Although Willick testified that this telephone conference occurred before his involvement in the case, there is no indication in the record that either party or their attorneys were informed of this telephone conference.
Additionally, the special prosecutor presented evidence that Judge Fine met alone with Dr. Elizabeth Ritchitt, another psychologist involved in the case, in chambers on *405 December 5, 1996. Dr. Ritchitt testified that she received a call from Judge Fine's office and was informed that a hearing would take place in a few days in Kinnard and that there was a possibility that Judge Fine might change custody of the minor child from the mother to the father. Dr. Ritchitt was also told that Judge Fine wanted her present at the hearing to assist the minor child with the transition if there indeed was a change in custody.
Dr. Ritchitt also testified that at the hearing on December 5, 1996, Judge Fine asked her to watch the minor child in Judge Fine's chambers while the hearing took place. Dr. Ritchitt stated that she did not discuss the case with Judge Fine, but was eventually called to testify as a witness at the hearing and was unaware of who had called her as a witness.

Count III: Kinnard
At the hearing, the special prosecutor presented evidence that during the proceedings in Kinnard Willick discovered that Garfield and Judge Fine were first cousins. Willick testified that Judge Fine had failed to disclose the relationship to the parties or their attorneys.
Judge Fine testified that Garfield is her first cousin, but that she had seen Garfield only three to four times in the last ten years. By stipulation, the Commission admitted a statement by Garfield where she indicated that she and Judge Fine had contact approximately twice in the last five years.
Additionally, Judge Fine testified that she did not disclose her relationship with Garfield because "[i]t was a professional decision; and in retrospect, I probably should have. . . . I did say she was a close personal friend because I did not  I didn't  did not want them to know there was a relationship."
The special prosecutor also presented a minute order dated May 9, 1996, which shows that Judge Fine subsequently ordered the parties in Kinnard to make arrangements to pay Garfield for her services as a mediator or be held in contempt of court. Subsequently, Judge Fine set an order to show cause hearing sua sponte regarding the parties' failure to pay Garfield. During the resulting hearing on June 3, 1996, either Judge Fine or Garfield indicated that Garfield and Judge Fine had previous ex parte communications about Garfield not being paid for her mediation services. Garfield, who participated in the hearing by telephone, stated that both parties had arranged payment plans with her, but had failed to make payments.
Judge Fine testified that if she became aware that experts were not being paid for their services, it was her common practice to issue an order to show cause to require the parties to explain why they had failed to pay the experts. As examples, Judge Fine referred to minute orders from other cases where she confronted the same problem of experts not being paid for their services. Judge Fine stated that Garfield did not receive any special treatment or consideration because of their relationship.

Count IV: Greisen
At the hearing, the special prosecutor presented a minute order dated February 21, 1996, which shows that in Greisen Judge Fine ordered Sheldon to perform an emergency evaluation to determine if it was in the minor child's best interests to be away from the father. Sheldon testified that no other judge, except Judge Fine, had him give an oral report in chambers regarding an assessment, without the parties or their attorneys present, before then testifying about the same report in open court. Essentially, Judge Fine first wanted to receive Sheldon's report in chambers before he testified to the same report in open court. Regarding the Greisen case, Sheldon confirmed that Judge Fine did have him give her an oral report in chambers before he subsequently testified about the report in court.[3]
In addition, other employees of FMAC testified that it was not necessarily unusual *406 to give an oral report for an emergency assessment to a judge in chambers before then being available to testify in court. However, a judge had to specifically request to receive an oral report in chambers before the employee testified. Moreover, it was not FMAC's policy to first give an oral report to a judge in chambers.
Judge Fine conceded that she had met and had spoken with Sheldon in chambers before going to court in Greisen. Judge Fine asserted that she did speak with Sheldon or other employees of FMAC in chambers and before going to court "not often, but sometimes." Judge Fine explained that in Greisen she spoke to Sheldon only because she and Sheldon were very busy, she took care to summarize Sheldon's oral report on the record, and that the parties questioned Sheldon about his report in open court.
On October 6, 1998, the Commission issued its findings of fact and conclusions of law. The Commission found that all the counts had been proven by clear and convincing evidence, except for Count II.[4] Specifically, the Commission found that Judge Fine had engaged in repeated ex parte communications as alleged in Counts I and IV and had appointed her first cousin as a mediator as alleged in Count III. Accordingly, based on its findings of fact, the Commission unanimously concluded as a matter of law that Judge Fine had violated ARJD 11(3) and Canons 2, 2A, 3B(7), and 3C(4).
Additionally, the Commission discussed "two additional instances of deplorable ex parte conduct [that] were clearly and convincingly established by the evidence," although these instances were not included in the formal statement of charges against Judge Fine.[5] First, in Kinnard, Judge Fine testified at the hearing that Dr. Caplan called her at approximately 11 p.m. at her home sometime in November 1996. At first, Judge Fine testified that no substantive matters in the Kinnard case were discussed. However, the Commission found that her later testimony revealed that Judge Fine had told Dr. Caplan to put his concerns in a letter, but that Dr. Caplan responded, "I am afraid if I put it in a letter to the parties or their lawyers, that the mother will run. That's what he did say."
Subsequently, Dr. Caplan did write a letter to Judge Fine detailing his concerns regarding the Kinnard case and expressly stating that he leaves "it to your discretion to determine how much, when and under what conditions you will release this information to the attorneys." Judge Fine maintained that she did not read the letter until she had a conference call with the attorneys involved in the Kinnard matter. Yet, the Commission found that "[t]he evidence clearly and convincingly establishes that after [Judge Fine] engaged in the telephone conference with Dr. Caplan and after she received Dr. Caplan's letter, she set a hearing in this matter without informing the attorneys as to the purpose of the hearing."
Indeed, the record makes clear that on June 25, 1996, Mr. and Mrs. Kinnard entered a divorce decree and custody agreement where Mrs. Kinnard gained physical custody of their minor child. At the time Judge Fine set a hearing date sua sponte, neither party in Kinnard currently had a motion pending before Judge Fine regarding custody. Willick testified that on November 18, 1996, he received notice from the district court that Judge Fine wanted to have a hearing the following day to consider changing custody from the mother to the father in Kinnard. Although Judge Fine sent Willick a copy of the letter that Dr. Caplan had sent to her, Willick wrote a letter to Judge Fine indicating that he did not request the hearing and was not given a reason as to why the hearing *407 had been set by Judge Fine or informed of the issues that were to be discussed.
Moreover, the record indicates that Judge Fine then directed her office to contact Dr. Ritchitt to request her presence at the hearing set by Judge Fine for the Kinnard case. Judge Fine's chambers informed Dr. Ritchitt that Judge Fine was considering changing the custody of the minor child in Kinnard from the mother to the father.
Ultimately, the hearing took place on December 5, 1996. At the hearing, Judge Fine called Dr. Caplan as a witness and questioned him. Dr. Caplan recited his concerns for the minor child, which essentially mirrored his observations in his letter. Judge Fine then called Dr. Ritchitt to the stand and asked questions about her observations of the minor child. Based on evidence presented at the hearing, Judge Fine ordered an immediate change in custody of the minor child from the mother to the father. Mrs. Kinnard testified at Judge Fine's formal hearing that Judge Fine's decision resulted in Mrs. Kinnard losing custody and nearly all contact with her son.
Second, also in Kinnard, the Commission found that the evidence clearly and convincingly established that Judge Fine received a copy of a letter that Dr. Ritchitt sent to Mrs. Kinnard. Based on the letter and without notifying any of the parties or their counsel, Judge Fine entered an order commanding that "the plaintiff, Laura Kinnard, shall have no contact with the parties [sic] minor child. . . unless a therapist is present to monitor their conversations."
Therefore, the Commission determined that Judge Fine "significantly altered important parental rights of the mother without notice or a hearing." Although the Commission notes that Judge Fine attempted to justify her actions by maintaining that the order was temporary, done in the best interest of the child, and done on an emergency basis, the Commission rejected her assertions in light of the fact that Dr. Caplan's letter to Judge Fine indicated that the matters discussed in his letter to Judge Fine did not constitute an emergency.
The two additional instances of misconduct in Kinnard contributed to the Commission's conclusion that "[Judge Fine's] conduct evidences a pattern of behavior which virtually eliminates the judicial process as established in the State of Nevada and the United States of America." Accordingly, the Commission determined that Judge Fine "discarded her judicial capacity and became an advocate."
After entering its findings of fact and conclusions of law, the Commission subsequently met on October 15, 1998, to impose discipline on Judge Fine. At the hearing, the Commission posed questions to Judge Fine and permitted her the opportunity to answer its questions. The Commission also heard arguments by Judge Fine's counsel. Eventually, having considered Judge Fine's answers and the arguments of her counsel, and having already entered its findings of fact and conclusions of law, the Commission took a recess and later returned to announce its imposition of discipline.
The Commission decided to discipline Judge Fine by removing her from office as a district court judge. The Commission stated in its decision that "in imposing the most severe penalty available to it upon [Judge Fine], [it] has determined that [Judge Fine's] conduct was willful in nature which is the burden imposed upon it by Article 6, Section 21(6)(a) of the Constitution of the State of Nevada."
Moreover, in reaching its decision, the Commission took into consideration its earlier decision in 1995 to discipline Judge Fine for engaging in ex parte communications with two other family court judges. In the previous case, "the Commission found that Judge Fine had numerous ex parte contacts with two fellow Family Court Judges in an attempt to influence their decision regarding a case in which she had served as counsel for one of the parties."
The Commission stated that "[i]n this case, Judge Fine has evidenced a continuing pattern of ex parte contacts albeit with therapists, psychologists, and court personnel regarding the ultimate issues presented to her for decision in the three cases set forth in the formal complaint." Therefore, the Commission noted that "Judge Fine in this case *408 before the Commission, violated the same provision of the Nevada Code of Judicial Conduct for which she was previously disciplined." Accordingly, "[t]he Commission . . . concluded that it had no alternative other than to remove Judge Fine from office."[6]

DISCUSSION

Whether clear and convincing evidence supports the Commission's findings that Judge Fine violated ARJD 11(3) and Canons 2, 2A, 3B(7), and 3C(4)
Judge Fine argues that clear and convincing evidence does not support the Commission's findings that she violated ARJD 11(3)[7] and Canons 2,[8] 2A,[9] 3B(7),[10] and 3C(4)[11] in Counts I, III, and IV. Specifically, Judge Fine contends: (1) in Count I and Count IV, that Judge Fine's ex parte communications with Sheldon were sanctioned by EDCR 5.70 and that Judge Fine's ex parte communications with Dr. Etcoff and Dr. Crowley were authorized by Canon 3B(7)(c)[12] and Duff v. Lewis, 114 Nev. 564, 958 P.2d 82 (1998); and (2) in Count III, that Judge Fine did not engage in nepotism or favoritism in appointing Garfield as a mediator in Kinnard and that Judge Fine routinely issued orders to show cause when parties failed to pay experts for their services.
"[Nevada's] constitution confines the scope of appellate review of the commission's factual findings to a determination of whether the evidence in the record as a whole provides clear and convincing support for the commission's findings." Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 267, 830 P.2d 107, 117-18 (1992). Although this court must defer to the Commission's factual findings, this court is not bound by the Commission's conclusions of law. See id.; see also Matter of Varain, 114 Nev. 1271, 1276, 969 P.2d 305, 309 (1998).
Judge Fine argues that her ex parte contacts with Sheldon from FMAC were authorized by EDCR 5.70. At the time the contacts occurred, EDCR 5.70(e)[13] provided that "[a] written assessment containing the findings and recommendations of the specialist will be submitted to the judge who ordered the services." EDCR 5.70(h) required that "[a]ny written assessment prepared by [FMAC] shall be delivered to the judge in chambers." Judge Fine contends that because of time constraints, Sheldon delivered oral reports to Judge Fine in chambers pursuant to EDCR 5.70(h).
*409 We conclude that EDCR 5.70 does not operate as an exception to Canon 3B(7). Indeed, Canon 3B(7) expressly provides that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding." (Emphasis added.) Here, in both McMonigle and Greisen, Judge Fine initiated and/or permitted ex parte communications with Sheldon concerning substantive matters in cases currently pending before her. It is true that Sheldon and other employees of FMAC testified that because of time constraints, they often gave oral reports in open court regarding emergency assessments and that these reports were later reduced to a written report pursuant to EDCR 5.70. However, we conclude that EDCR 5.70 does not justify Judge Fine's ex parte contacts with Sheldon. There was sufficient evidence in both cases to support the Commission's conclusion that Judge Fine was not simply receiving information from Sheldon; she was developing testimony and evidence to be used by her in reaching a decision in those cases. This is outside the scope of EDCR 5.70.[14]
Judge Fine next argues that Canon 3B(7)(c) and Duff sanctioned her ex parte contacts with Dr. Etcoff and Dr. Crowley. Canon 3B(7)(c) provides that "[a] judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges." However, NCJC does not define "court personnel" except to say that it does not include attorneys in a proceeding before a judge. See NCJC, Terminology. Nonetheless, Judge Fine argues that Dr. Etcoff and Dr. Crowley should be considered court personnel under Duff.
In Duff, we confronted "the issue of whether court-appointed professionals assisting the judge in evaluating individuals involved in a legal action are entitled to absolute quasi-judicial immunity." Duff, 114 Nev. at 568, 958 P.2d at 85. After the Nevada State Board of Psychological Examiners reprimanded a psychologist involved in Duff, Duff filed suit against the psychologist seeking damages for the psychologist's alleged negligence.
In discussing whether court-appointed experts should be granted immunity, we noted that the psychologist in Duff "was serving as `an arm of the court' and `performed a function integral to the judicial process.'" Id. at 570, 958 P.2d at 86 (quoting Seibel v. Kemble, 63 Haw. 516, 631 P.2d 173, 179 (1981)). Should experts be exposed to liability for performing quasi-judicial duties, we observed that it would deter experts from accepting court appointments or could affect an expert's recommendations. Ultimately, we held that the psychologist was "entitled to absolute quasi-judicial immunity from Duff's suit because `(1) at least to some extent, his evaluations and recommendations aided the trial court in determining child custody, and (2) his services were performed pursuant to a court order.'" Id. at 571, 958 P.2d 82, (quoting Lavit v. Superior Court, 173 Ariz. 96, 839 P.2d 1141, 1146 (1992)).
The Commission argues that Duff is distinguishable from the instant case because Duff involved issues of quasi-judicial immunity and tort liability instead of the judicial canons. While such a distinction can be made, we conclude that the Duff analysis is applicable to the instant case. Experts appointed pursuant to an order of a court for the purpose of providing information that a court may utilize in rendering a decision are an arm of the court. They are quasi-judicial personnel and can fall within the concept of "court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities." However, not every communication between a court-appointed expert and a judge is permissible under Canon 3B(7)(c).
The exception embodied in Canon 3B(7)(c) was designed to give a judge some flexibility in supervising judicial employees in the performance of their duties. For example, a judge must necessarily engage in ex parte communications with a law clerk in order to advise the law clerk on how to draft a disposition *410 or research an issue. It was not intended to permit a judge to circumvent other provisions of the Canons or become an advocate for one of the parties. Thus a judge could not, under the auspices of communicating with court personnel, instruct a law clerk to independently gather evidence in support of a party's position.
Because court-appointed experts are court personnel under the Canons for a limited purpose, the restrictions governing ex parte communications should be more severe than those which may apply to general court employees. Any ex parte communications with court-appointed experts should be limited to procedural or administrative matters. Matters involving the merits or substance of a case must not be discussed outside the presence of the parties. Moreover, the content of procedural or administrative communications should be promptly documented and forwarded to the parties so as to afford them an opportunity to respond to the court's actions.
In this case, the Commission concluded that the communications between Judge Fine and Dr. Etcoff involved matters of substance. Indeed, after a conference involving Dr. Etcoff, Judge Fine made decisions on disputed issues and issued rulings in the McMonigle case. Moreover, the Commission concluded that Judge Fine's actions amounted to advocacy upon behalf of the children. This is not the type of communication permitted under Canon 3B(7)(c).
As to Dr. Crowley, the record considered by the Commission indicates that Dr. Crowley was not acting as an arm of the court. The record specifically shows that Dr. Crowley was first approached, hired, and paid for by Mr. McMonigle. Thus Dr. Crowley cannot be "court personnel" as contemplated by the Canons. Therefore, we conclude that neither our decision in Duff nor Canon 3B(7)(c) authorizes Judge Fine's ex parte communications with Dr. Etcoff or Dr. Crowley.
Judge Fine emphasizes that she took care in informing the parties of her ex parte discussions with Sheldon, Dr. Etcoff, and Dr. Crowley after they occurred. In making the argument that she kept the parties apprised of her ex parte contacts, Judge Fine appears to rely on Canon 3B(7)(a) as support for her position. Judge Fine contends that by informing the parties of her ex parte communications, she was complying with the Canons or that her violations were inadvertent. However, Canon 3B(7)(a) provides that ex parte communications for scheduling, administrative matters, or emergencies that do not deal with substantive matters are permitted if the judge believes that no party would gain a procedural or tactical advantage and the judge promptly notifies all the parties of the ex parte communication. See Canon 3B(7)(a). Because Judge Fine engaged in ex parte communications regarding substantive matters, we conclude that Canon 3B(7)(a) provides no support to Judge Fine's arguments.[15]
As noted above, the Commission unanimously concluded that Judge Fine violated Canons 2A and 3B(7) in Count I and Canons 2, 2A, and 3B(7) in Count IV, both of which constituted grounds for removal under ARJD 11(3). Based on the foregoing, we conclude that clear and convincing evidence supports the Commission's findings that Judge Fine engaged in numerous and repeated ex parte communications as detailed in Counts I and IV.
As to Count III, although Judge Fine concedes that she appointed her first cousin as a mediator in Kinnard, Judge Fine next argues that she did not engage in nepotism or favoritism in making the appointment. Judge Fine urges this court to utilize the definition of a "member of the judge's family" as used in NCJC in determining whether *411 Judge Fine violated Canons 2, 2A, and 3C(4). NCJC defines a "member of the judge's family" as "a spouse, child, grandchild, parent, grandparent or other relative or person with whom the judge maintains a close familial relationship." NCJC, Terminology. Judge Fine contends that Garfield should not be considered a member of her family within the meaning of NCJC because Judge Fine and Garfield did not have a close relationship and rarely saw each other.
Because Canon 3C(4) does not reference "a member of the judge's family," we conclude that the definition of "a member of the judge's family" as used in NCJC is inapplicable to this case. "A member of the judge's family" is only referenced in Canons 4D(3), 4E, and 4G, all of which involve a judge's participation in the business or legal affairs of members of his/her family. Accordingly, we conclude that looking to whether Garfield fits within the definition of a member of Judge Fine's family is not helpful to a determination of the ultimate question in this case.
Black's Law Dictionary defines nepotism as a "[b]estowal of patronage by public officers in appointing others to positions by reason of blood or marital relationship to appointing authority." Black's Law Dictionary 1039 (6th ed.1990). Black's Law Dictionary also defines favoritism as "[i]nvidious preference and selection based on friendship and factors other than merit." Id. at 609.
Judge Fine asserts that Garfield was the only mediator known to her in New Mexico and that the parties suggested no alternative mediator. Moreover, Judge Fine suggests that the mere fact that the only known mediator in New Mexico happened to be a relative does not warrant the conclusion that she engaged in nepotism or favoritism.
After reviewing the record on appeal, we conclude that there is clear and convincing evidence to support the Commission's findings of fact with respect to the issues of nepotism and favoritism. The Commission concluded that by appointing her first cousin as a mediator in Kinnard, Judge Fine did engage in nepotism because she bestowed patronage on Garfield based on their familial relationship. Although it is true that Garfield happened to be both a family member and the only New Mexico mediator known to Judge Fine, she made the appointment, at least in part, due to her relationship with Garfield.
The record also supports the Commission's conclusion that Judge Fine committed favoritism by appointing Garfield because, again, she selected Garfield based, at least in part, on their relationship. No party has alleged that Garfield was in any way unqualified to act as a mediator. However, because of the relationship between Garfield and Judge Fine, the Commission unanimously concluded that Judge Fine violated Canons 2, 2A, and 3C(4) in Count III, which constituted grounds for removal under ARJD 11(3). Accordingly, we again conclude that a review of the record reveals clear and convincing evidence to support the Commission's findings that Judge Fine improperly appointed her first cousin as a mediator as detailed in Count III.
Judge Fine also argues that she routinely issued orders to show cause when parties failed to pay experts for their services. Accordingly, she contends that she did not afford Garfield any special treatment or consideration in Kinnard.
The record on appeal includes numerous letters from Dr. Ritchitt to Judge Fine indicating that Dr. Ritchitt had not been paid in several unrelated cases. Most of the resulting minute orders in those cases show that Judge Fine merely discussed the non-payment of Dr. Ritchitt with the parties in court. However, the minute orders in two cases indicate that Judge Fine threatened that if Dr. Ritchitt was not paid, she would incarcerate the party responsible for the non-payment.
We conclude that the minute orders do not necessarily evidence a pattern of Judge Fine setting orders to show cause when parties failed to pay experts. Certainly, these two incidents show that Judge Fine threatened parties with incarceration for failing to pay experts. Yet, the instant matter involves Judge Fine setting orders to show cause, not threatening to incarcerate parties who fail to *412 pay an expert. Accordingly, although Judge Fine asserts that she routinely issued orders to show cause when parties failed to pay experts, we conclude that the correspondence between Dr. Ritchitt and Judge Fine, as well as the minute orders, fail to support Judge Fine's testimony. Accordingly, we conclude that clear and convincing evidence supports the Commission's findings that Judge Fine improperly issued the orders to show cause as detailed in Count III.

Whether the Commission erred by considering uncharged conduct committed by Judge Fine
Judge Fine argues that the Commission erred by considering the two additional instances of misconduct involving Dr. Caplan and Dr. Ritchitt in Kinnard. Because these two additional instances were not included in the formal charges against her, Judge Fine asserts that she was denied due process when the Commission found that her actions regarding these incidents also constituted a violation of the Canons.
Having already made and adopted its findings of fact and conclusions of law regarding Counts I, III, and IV, the Commission felt it was "appropriate to set forth in some detail the reasoning underlying its Decision." Accordingly, the Commission detailed the specific reasons why it found that clear and convincing evidence did establish that Judge Fine violated various Canons in Counts I, III, and IV, but did not violate the Canons as alleged in Count II. In this context, the Commission discussed the Caplan and Ritchitt incidents, finding that "two additional instances of deplorable ex parte conduct were clearly and convincingly established by the evidence."
As noted above, the first incident involved Judge Fine engaging in ex parte communications with Dr. Caplan in the Kinnard case. Upon receiving a letter from Dr. Caplan, Judge Fine sua sponte set a hearing regarding the minor child's custody without first informing the parties of the reasons for the hearing and without any motion currently pending before the court. At the hearing, Judge Fine called witnesses to testify and eventually changed custody from the mother to the father.
In the second incident, Judge Fine entered an order in Kinnard without notifying any of the parties or their counsel. After an ex parte communication with Dr. Ritchitt, Judge Fine entered an order preventing Mrs. Kinnard from having any contact with her child unless a therapist was present.
We conclude that Judge Fine was not denied due process in this case. The focus of Judge Fine's contention is that she was denied due process by not being informed that she would have to defend against these two additional instances of misconduct. Judge Fine argues that the Commission erred in considering them because the Commission did not include these two incidents in their complaint and she did not have adequate notice that the Commission would be considering them.
We conclude, however, that Judge Fine's argument is undermined by a careful review of the entire record on appeal. Upon reviewing Judge Fine's testimony, it is clear the testimony regarding these additional conversations with Dr. Caplan and Dr. Ritchitt was not solicited by the special prosecutor. The special prosecutor was questioning Judge Fine about the incidents involving Dr. Caplan and Dr. Ritchitt which were contained in the complaint. In response to those questions, Judge Fine also testified as to the two additional incidents in her effort to give a complete picture of the Kinnard case and to explain that her actions were taken because she believed the orders were necessary to protect the child. For example, on direct and cross-examination, Judge Fine discussed in detail her conduct relating to receiving Dr. Caplan's letter and her subsequent actions in setting a hearing based on the letter. Accordingly, we conclude that Judge Fine was not denied due process because once she presented evidence regarding these incidents, the Commission was free to consider them in determining whether or not Judge Fine made improper ex parte communications in the Kinnard case. In addition, the Commission was free to consider all the evidence, including these additional instances of ex parte communications, in making a *413 determination on the issue of willful misconduct.
Finally, although the Commission certainly considered these two additional incidents by discussing them in its findings of facts and conclusion of law, we conclude that the record does not support Judge Fine's contention that the Commission relied primarily upon these two incidents in deciding to remove her from office. Indeed, a simple review of the Commission's decision to remove Judge Fine reveals no references to these additional incidents.
Even if the Commission considered these incidents as additional charges, we conclude that the Commission would have reached the same decision irrespective of whether or not it had considered these two incidents. As mentioned above, substantial evidence was presented against Judge Fine. Accordingly, we conclude that if the Commission did err by adding additional counts on the basis of such evidence, any error was harmless. See, e.g., In re Inquiry Concerning a Judge, 357 So.2d 172 (1978) (holding that improper notice of hearing and charges was harmless error).

Whether the Commission's decision to remove Judge Fine from her office as a district court judge is warranted by the record
Finally, Judge Fine argues that the Commission's decision to remove her from office is not warranted by the record because she did not engage in willful misconduct. Judge Fine contends that the term "willful misconduct" includes an element of "bad faith" or "malice." As the Commission found that she acted with "good intentions," Judge Fine asserts she cannot be removed from office.
The Nevada Constitution requires that this court "exercise [its] independent judgment regarding the appropriate sanction warranted by factual findings properly adduced by the commission." Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 268, 830 P.2d 107, 118 (1992); see also Nev. Const. art. 6, § 21(1). Moreover, under the Nevada Constitution, a judge cannot be removed from office except for willful misconduct, willful or persistent failure to perform the duties of his office, or habitual intemperance. See Nev. Const. art. 6, § 21(8)(a).[16]
Willful misconduct is a term of art, not easily defined. "Willful" is a word "of many meanings, its construction often being influenced by its context." Screws v. United States, 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (citing Spies v. United States, 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418 (1943)). As a general rule, the word denotes an act which is intentional, or knowing, or voluntary, rather than accidental. United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381 (1933). Thus "willful misconduct" encompasses an intentional or knowing violation of the judicial canons.
This court has previously considered this issue and has rejected Judge Fine's argument. See Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 294-95, 830 P.2d 107, 134-35 (1992). We have stated that the relevant inquiry regarding willful misconduct is an inquiry into the intentional nature of the actor's conduct and not whether the actor was acting out of malice or ill will. The fact that an actor may have acted with the best of intentions does not relieve the actor of liability. See In re Rowe, 566 A.2d 1001, 1006 (Del.1989) (not requiring a finding of bad faith); In re Cieminski, 270 N.W.2d 321, 327 (N.D.1978) (holding that for acts to be labeled as willful misconduct, they must simply be a result of the performer's free will).
We are mindful that other jurisdictions have held that bad faith is a necessary element of willful misconduct. See e.g., Gubler v. Commission on Judicial Performance, 37 Cal.3d 27, 207 Cal.Rptr. 171, 688 P.2d 551 (1984); In re Nowell, 293 N.C. 235, 237 S.E.2d 246 (1977); Matter of Edens, 290 N.C. 299, 226 S.E.2d 5 (1976); In re Worthen, 926 P.2d 853 (Utah 1996). We, however, reject *414 such a requirement in cases of intentional or knowing violations of the Canons.
We conclude that willful misconduct occurs when the actor knows he or she is violating a judicial canon or rule of professional conduct and acts contrary to that canon or rule in spite of such knowledge.[17]
In the present case, the Commission concluded that Judge Fine's actions were willful in nature based on the evidence presented. In reaching this conclusion, the Commission also took into account its earlier decision in 1995 to discipline Judge Fine for engaging in ex parte communications with two other family court judges. Thus, the Commission noted that "Judge Fine in this case before the Commission, violated the same provision of the Nevada Code of Judicial Conduct for which she was previously disciplined."
We conclude that the Commission's decision to remove Judge Fine from office was warranted in light of the record on appeal. As the record makes clear, Judge Fine engaged in numerous and repeated ex parte communications with experts retained by the parties or appointed by her. In McMonigle, Judge Fine willfully and intentionally engaged in misconduct by initiating the ex parte contacts with Dr. Etcoff and with Dr. Crowley, who had been hired by Mr. McMonigle. In Greisen, Judge Fine again acted willfully and intentionally by initiating the contact with Sheldon in order to request and receive an oral report in chambers, instead of waiting to receive the report on the record and in open court. This contact, together with Sheldon's presence during the ex parte communications in McMonigle, supports the Commission's conclusion that Judge Fine did not simply receive a report from Sheldon, but instead discussed substantive matters as an advocate for a particular position. Furthermore, in Kinnard, Judge Fine willfully and intentionally engaged in misconduct by appointing Garfield, her first cousin, to the case and failed to inform the parties of their relationship.
Judge Fine engaged in these actions after already having been disciplined once under Canon 3 for engaging in ex parte communications with other district court judges. Based on the overwhelming nature of the evidence in this case and in light of Judge Fine's previous discipline for the same misconduct, we conclude that Judge Fine's actions show she knowingly acted in derogation to the judicial canons and, therefore, her actions amounted to willful misconduct. Simply put, Judge Fine should have known better. Although Judge Fine continually argues that her ex parte contacts were arguably with "court personnel" and were therefore not willful and not done in bad faith, we conclude that her argument is belied by the overwhelming evidence in this case and by the fact that she had already been disciplined for similar misconduct.[18]

*415 CONCLUSION

For the foregoing reasons, we conclude that clear and convincing evidence supports the Commission's findings that Judge Fine violated ARJD 11(3) and Canons 2, 2A, 3B(7), and 3C(4), thereby justifying her removal from office as a district court judge. We further conclude that the Commission did not err in considering uncharged conduct committed by Judge Fine. Finally, we conclude that the Commission's decision to remove Judge Fine from her office was warranted by the record in this case. Accordingly, we affirm the decision of the Commission to remove Judge Fine from office in its entirety.[19]
NOTES
[1] The provisions of the ARJD were enacted by this court prior to the 1998 amendments to the Nevada Constitution. Section 21(5) of the Nevada Constitution now vests the power of establishing the grounds upon which a judge may be censured with the legislature while the Commission may only adopt rules governing the conduct of its hearings or other procedural rules necessary to carry out its duties.
[2] Without objection, the Commission admitted as exhibits the transcripts of the testimony of the witnesses from the probable cause hearing. Accordingly, we will discuss testimony and evidence presented at both the probable cause hearing and at the formal hearing.
[3] Although the formal charges originally indicated that the ex parte meeting between Sheldon and Judge Fine occurred on March 21, 1997, the Commission granted the special prosecutor's motion to amend the charges in Count IV to reflect that the meeting actually occurred on February 21, 1996.
[4] Regarding Count II, the Commission found that although Judge Fine did conduct ex parte communications with Garfield, Dr. Caplan, and Dr. Ritchitt in Kinnard, clear and convincing evidence did not establish that substantive matters were discussed during these communications. Therefore, the Commission concluded that Judge Fine did not violate ARJD or the Canons as alleged in Count II.
[5] Evidence regarding these incidents was not presented as a part of the special prosecutor's case, rather this information was included by Judge Fine as a part of her explanation of exactly what took place in Kinnard and why she felt her ex parte communications and subsequent actions were appropriate under the circumstances.
[6] Commissioner Michael R. Griffin, a district court judge for the First Judicial District, dissented from the Commission's decision to remove Fine. Although he noted that "the conduct of Judge Fine was well outside the conduct expected from a judge and warrants severe discipline," Commissioner Griffin dissented because "it is [his] opinion that `willful misconduct' as required by the Constitution involves a knowing and deliberate violation of law or dishonesty."
[7] ARJD 11(3) provides, in pertinent part, that the "[g]rounds for discipline by censure, removal, or the other forms of discipline provided in Rule 30 are . . . [a]ny acts or omissions in the performance of judicial or administrative duties which contravene provisions of the Nevada Code of Judicial Conduct."
[8] Canon 2 states that "[a] judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities."
[9] Canon 2A provides that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary ."
[10] Canon 3B(7) states, in relevant part:

A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding. . . .
[11] Canon 3C(4) provides, in pertinent part, that "[a] judge shall avoid nepotism and favoritism" when making appointments.
[12] Canon 3B(7)(c) states that "[a] judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges."
[13] In 1997, EDCR 5.70 was substantially rewritten to reflect that FMAC no longer performs court-ordered assessments. Instead, FMAC now operates the district court's mandatory mediation program for child custody matters in Clark County. See EDCR 5.70.
[14] Judge Fine did not assert that her communications with Sheldon fell within the exception delineated under Canon 3B(7)(c). We therefore decline to address this issue.
[15] Without citing to the record, Judge Fine also argues that the parties in McMonigle granted her permission to speak with Dr. Crowley on March 28, 1993. We conclude that after a careful review of the entire record on appeal, the record belies Judge Fine's assertion. During the formal hearing, Judge Fine initially testified on direct examination that the parties stipulated to her receiving an oral report from Dr. Crowley. However, on cross-examination, Judge Fine admitted that her recollection was incorrect and that she did not have permission from the parties in McMonigle to have an ex parte discussion with Dr. Crowley.
[16] Both Judge Fine and the Commission cite to Nevada Constitution Article 6, Section 21(6)(a). However, in 1998, the Nevada Constitution was amended and the "willful misconduct" provision is now found at Nevada Constitution Article 6, Section 21(8)(a).
[17] Any language in Goldman that suggests bad faith is synonymous with willful misconduct is hereby disapproved.

In 1999, subsequent to the events relevant to this case, the Nevada Legislature, pursuant to the authority granted to the Legislature by the 1998 amendments to the Nevada Constitution, has defined "willful misconduct" in NRS 1.4653(4)(b) to include, inter alia:
(2) A knowing or deliberate violation of one or more of the provisions of the Nevada Code of Judicial Conduct;
(3) A knowing or deliberate act or omission in the performance of judicial or administrative duties that:
. . . .
(II) Tends to corrupt or impair the administration of justice. . . .
Our ruling today is not based on this statute, as it was not in effect at the time of the incidents relevant to this dispute.
[18] Judge Fine also argues that the Commission's notice to appear on October 15, 1998, for the imposition of discipline failed to sufficiently inform her of the procedures for the hearing. Specifically, Judge Fine contends that if she had known the Commissioners would be permitted to question her, she would have sought to present witnesses in mitigation of punishment. Because Judge Fine fails to cite any legal authority in support of her position, we decline to consider Judge Fine's argument. See SIIS v. Buckley, 100 Nev. 376, 382, 682 P.2d 1387, 1390 (1984). Even if we chose to address her contention, the Commissioners only questioned Judge Fine in an attempt to better understand her perspective regarding her role as a judge and to discern whether she had learned anything from the proceedings. Although the notice to Judge Fine could have detailed the procedures for the hearing with greater specificity, it appears from the record that the Commission took great care in making its decision and acted cautiously in rendering its decision.
[19] The Honorable A. William Maupin, Justice, voluntarily recused himself from participation in the decision of this matter.

The Honorable Myron Leavitt, Justice, did not participate in the decision of this matter.